Pierre G. **DECALONNE**, Plaintiff,

v.

**G.I. CONSULTANTS, INC.**, Defendant.

No. 1:01–CV–37.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

April 10, 2002.

Cynthia Rockwell, Haller and Colvin, Fort Wayne, IN, for Pierre G DeCalonne, plaintiff.

Stacey L Katz, Laura L Reuss, Beers Mallers Backs and Salin, Fort Wayne, IN, Craig R Patterson, Wendy W Davis, Tandra S Johnson, Beckman Lawson Sandler Snyder and Federoff, Fort Wayne, IN, David A Gunter, Dean Mead, Viera, FL, for G I Consultants Inc, defendants.

Thomas R. Lemon, Lemon Armey Hearn & Leininger, Warsaw, IN, for Thomas R. Lemon, mediator.

### MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

On January 24, 2001, Plaintiff Pierre G. DeCalonne ("DeCalonne") filed a complaint against his former employer, G.I. Consultants, Inc. ("G.I.Consultants"), alleging that G.I. Consultants had discharged him in violation of the federal False Claims Act, 31 U.S.C. § 3729 et seq. DeCalonne also brought pendant state law

claims under the Indiana Wage Payment Statute, Ind.Code § 22–2–5, as well as for retaliatory discharge and breach of contract. G.I. Consultants moved for summary judgment on all of DeCalonne's claims on November 30, 2001. Plaintiff filed a response in opposition to the motion for summary judgment on February 4, 2002, to which G.I. Consultants replied in support of its pending motion on February 19, 2002.

Also on February 19, 2002, Defendant filed a motion to strike portions of the affidavit testimony of Pierre DeCalonne and for attorney fees. Plaintiff opposed the motion to strike and the motion for attorney fees on February 28, 2002. G.I. Consultants filed their reply on March 14, 2002. On March 15, 2002, Plaintiff moved to have this final reply ignored on the basis that it was untimely filed. Defendant opposed the motion to have its reply ignored on March 19, 2002.

For the reasons set forth herein, Defendant's motion for summary judgment will be GRANTED in part, and DENIED in part. Plaintiff's claims under the Indiana Wage Payment Statute will be STAYED pending the outcome of *St. Vincent Hospital & Health Care Center v. Steele*, 742 N.E.2d 1029 (Ind.App.2001), *trans. granted.* Defendant's motion to strike and motion for attorney fees will be DENIED. Plaintiff's motion to ignore Defendant's March 14, 2002 reply will be DENIED.

### FACTUAL BACKGROUND

#### I. DeCalonne's Employment with G.I. Consultants

G.I. Consultants is a local medical practice specializing in gastrointestinal medicine. G.I. Consultants is governed by a Board of Directors consisting of all physicians at G.I. Consultants. (Memorandum in Support of Defendant's Motion for Summary Judgment p. 2, n. 2).

DeCalonne was employed beginning in 1993 as G.I. Consultants' Practice Administrator. (DeCalonne Aff. ¶ 2).[1] On or about July 19, 1996, DeCalonne entered into a written employment agreement with G.I. Consultants which stated that it would continue in effect until December 31, 2001. (Complaint Ex. A). The employment contract provided that G.I. Consultants could (1) on ninety days prior written notice, discharge DeCalonne without cause or (2) discharge DeCalonne with cause without any prior written notice. (Complaint Ex. A.).

As Practice Administrator, DeCalonne reported directly to the Board of Directors. DeCalonne's duties and responsibilities as Practice Administrator included implementation of Board objectives, management of the office, the computer system and personnel, payment of accounts payable, implementation of an electronic payroll system, preparation of the agenda for Board meetings, and record keeper at Board meetings. (DeCalonne Dep. 13–14).

#### II. Conflicts Between DeCalonne and Dr. Kaplan and the Board

Sometime in 1997, at the request of some G.I. Consultants physicians, DeCalonne implemented a productivity bonus compensation system. Under this system, Dr. Martin Kaplan's ("Dr.Kaplan") bonus was the lowest among all the physicians at G.I. Consultants. (DeCalonne Dep. 25). Also in 1997, Dr. Kaplan returned G.I. Consultants' payroll system to a manual

---

1. In this Order, the Court refers to the affidavit testimony of Pierre DeCalonne and Christy Degitz as "DeCalonne Aff." and "Degitz Aff.," respectively. The deposition testimony of Pierre DeCalonne, Dr. Martin Kaplan, Dr. Ricky Meyer, Dr. Warren Hauck, and Dr. Kaleem Ahmed is referred to as "DeCalonne Dep.," "Kaplan Dep.," "Meyer Dep.," "Hauck Dep.," and "Ahmed Dep.," respectively.

system from a computerized system. DeCalonne objected to this decision. (DeCalonne Dep. 25–26).

Sometime in 1998 or 1999, DeCalonne asked his niece, a CPA, to review G.I. Consultant's books. DeCalonne's niece noticed that G.I. Consultant's books were not in line with the books of Baden, Gage, and Schroeder, G.I. Consultant's accountant. As a result, DeCalonne requested correcting entries from Baden, Gage, and Schroeder so that G.I. Consultants would have an accurate picture of how it was doing financially. In response, Dr. Kaplan instructed DeCalonne that he was not to behave as a "junior accountant" and that he should leave the books to Baden, Gage, and Schroeder. (DeCalonne Dep. p. 27).

Also around that time, DeCalonne noticed that there was a large increase in the fees G.I. Consultants charged for fiscal year 1998. He requested additional information from Baden, Gage, and Schroeder and presented the numbers to the Board. Shortly thereafter, DeCalonne states that his job responsibilities were curtailed. (DeCalonne Dep. 27–28).

In August 1999, the Board questioned DeCalonne about what he did for the corporation since the doctors had reduced some of his job responsibilities. In response to the Board's inquiry, DeCalonne logged his daily work from August 31, 1999 to September 24, 1999 and gave each doctor a copy of the report. The Board conceded that DeCalonne was sufficiently performing work beneficial to G.I. Consultants. DeCalonne's performance was never questioned again until after the events giving rise to the instant action. (DeCalonne Dep. ¶ 10).

### III. The Fraud and Abuse Compliance Program

In early November 1998, DeCalonne received a letter from G.I. Consultant's attorney, Pete Mallers, warning DeCalonne about increased federal investigations into Medicare and Medicaid fraud and abuse and the steps some health care providers were taking to protect themselves. (DeCalonne Aff. Ex. 5). DeCalonne believed that creating a fraud and abuse compliance ("FAC") program was within his job responsibilities and began to discuss with the Board the need for such a program. (DeCalonne Dep. 34; Ahmed Dep. 18). DeCalonne attended three national conferences to educate himself about fraud and abuse issues. (DeCalonne Dep. 36).

In December 1998, DeCalonne believed that, with a few minor exceptions, G.I. Consultants was in compliance with fraud and abuse regulations (DeCalonne Dep. 37). In early 1999, G.I. Consultants conducted a brief internal coding review. (DeCalonne Dep. 38). This review looked at the codes the doctors used to see if they fell with a standard bell curve of frequency.

Subsequent to the internal review, DeCalonne, on behalf of G.I. Consultants, hired the firm of Heaton & Eadie to conduct a baseline study of compliance within the corporation. (DeCalonne Dep. 41–43). DeCalonne did not hire Heaton & Eadie in order to gain information that he could then turn over to the government. Rather, DeCalonne wanted a neutral study so that the corporation would have an idea of what changes to implement. (DeCalonne Dep. 51). To facilitate the audit, DeCalonne submitted confidential patient information to Heaton & Eadie. (DeCalonne Aff. ¶ 19; DeCalonne Dep. 40). The parties dispute whether DeCalonne had authorization from the Board to do so. DeCalonne has submitted a copy of the minutes of the June 7, 1999 Board meeting in which he informed the Board that Heaton & Eadie would require ten charts from each G.I. Consultants physician. (DeCalonne Aff. Ex. 11). Defendant, on

the other hand, submits the deposition testimony of Drs. Kaplan, Meyer, and Hauck, indicating that the Board had not authorized the release of confidential patient information for purposes to the Heaton & Eadie audit. (Kaplan Dep. 33; Meyer Dep. 19–20; Hauck Dep. 26–27).

On May 18, 2000, Heaton & Eadie sent DeCalonne the complete base line study report which showed areas of potential liability for G.I. Consultants for fraud and abuse. The report showed a 75 percent error rate in selecting the appropriate billing codes, most of which were caused by billing for a higher level of service than was documented by the doctors. (DeCalonne Aff. ¶ 20; Ex. 14). Specifically, G.I. Consultants was under-billing 30 percent of the time and over-billing 44 percent of the time. (DeCalonne Dep. 51). For two physicians—Drs. Kaplan and Ziglstra—the rate of over-billing was higher than the average. Dr. Kaplan over-billed 44 percent of the time and Dr. Ziglstra overbilled 39 percent of the time. Dr. Kaplan did not under-code at all. (DeCalonne Dep. 52). Heaton & Eadie concluded that G.I. Consultants was "at an exceptionally high exposure level" in the event of a federal compliance audit. (DeCalonne Aff. ¶ 20; Ex. 14).

DeCalonne gave the entire report to Dr. Kaleem Ahmed ("Dr.Ahmed"), G.I. Consultants' corporate compliance officer, and distributed to each doctor the overall report summary along with that individual doctor's audit results. Dr. Ahmed and DeCalonne decided to have Heaton & Eadie come in to go over the report with the doctors as a group and individually and then conduct training on coding issues with the doctors and the billing department. (DeCalonne Aff. ¶ 20). The Heaton & Eadie report, as well as the plan to bring someone from Heaton & Eadie in for training, was discussed at the June 5, 2000 Board meeting. The three doctors present at the June 5, 2000 Board meeting agreed with DeCalonne's recommendation that the Heaton & Eadie auditor present the report personally and asked DeCalonne to schedule the presentation. None of the three doctors present at the June 5, 2000 Board meeting complained about the manner in which the audit was conducted or the fact that patient charts had been reviewed in the process. DeCalonne scheduled a special meeting for July 3, 2000 at which the Heaton & Eadie auditor would be present. (DeCalonne Aff. ¶ 21).

Soon after the June 5, 2000 Board meeting, for which Dr. Kaplan was absent, Dr. Kaplan called DeCalonne into his office. Dr. Kaplan was holding the report in this hands and was angry. He asked DeCalonne who had authorized the audit. He insisted that the Board had not authorized the audit. (DeCalonne Aff. ¶ 21).

DeCalonne spoke with Dr. Imad Horani ("Dr.Horani") and Dr. Hauck about his concern over Dr. Kaplan's reaction to the report. Dr. Horani advised DeCalonne to lay low and allow the matter to drop. Both Dr. Horani and Dr. Hauck indicated that the doctors saw the report and his pursuit of the FAC program as harmful to the doctors. At about the same time, Dr. Kaplan ordered DeCalonne to cancel the July 3, 2000 meeting with the Heaton & Eadie auditor. From these actions, DeCalonne inferred that the Board intended to table the FAC program indefinitely. He believed that this situation put him at risk of personal liability. (DeCalonne Aff. ¶ 22).

In anticipation of the FAC program being permanently placed on hold and because Dr. Kaplan was so angry about the report, DeCalonne contacted attorney Keith Barber ("Barber") to advise him as to whether there really was a potential federal false claims action based on the report and what he should do to comply

with this legal obligations. Pursuant to Barber's legal advice, DeCalonne prepared a detailed memorandum to the Board in anticipation of the upcoming July 10, 2000 Board meeting. DeCalonne states that he intended the memorandum to notify the Board that he intended to fully comply with a federal fraud and abuse audit if G.I. Consultants was ever targeted for one. DeCalonne also states that in his continuing conversations about the FAC program with some of the doctors, he told them that he would have to do something about the non-compliant billing practices if they did not take corrective measures by proceeding with the FAC program. (DeCalonne Aff. ¶ 23).

At the July 10, 2000 Board meeting, DeCalonne handed each doctor a copy of the memorandum that attorney Barber helped him write. He specifically informed the Board that the results of the Heaton & Eadie audit showed a potential for a federal false claims action. (DeCalonne Aff. ¶ 24). Dr. Kaplan became angry when he reviewed the memo and again demanded to know who authorized hiring Heaton & Eadie to conduct the audit. The conversation became so heated that Dr. Kaplan ordered DeCalonne to leave the meeting. (DeCalonne Aff. ¶ 25; DeCalonne Dep. 156).

After the July 10, 2000 meeting, Dr. Horani told DeCalonne that he had to quit talking about the FAC program and indicated that the Board had decided to handle the fraud and abuse issues "their own way." (DeCalonne Aff. ¶ 26). DeCalonne did as Dr. Horani instructed until the annual meeting on July 24, 2000. At the July 24, 2000 meeting, DeCalonne raised the issue of the FAC program and the base line audit while G.I. Consultants' legal counsel was present. DeCalonne hoped that G.I. Consultants' counsel would support his concern that there was a potential false and fraudulent claims action.

DeCalonne was again ejected from the meeting. (DeCalonne Aff. ¶ 27).

The next day, July 25, 2000, Dr. Kaplan wrote a letter discharging DeCalonne from employment with G.I. Consultants and identifying eight specific factors leading to DeCalonne's termination. (DeCalonne Dep. 93; Kaplan Dep. 69; Termination Letter). Among these eight factors were DeCalonne's alleged unauthorized release of confidential patient records, his failing job performance, and his inability to work with other G.I. Consultants' staff. (Termination Letter). However, the breach of patient confidentiality was the triggering event for DeCalonne's termination. (Kaplan Dep. 28–29).

## IV. Disputed Wages

DeCalonne's salary for the year 2000 was $74,043.07. (DeCalonne Dep. 64). His last day at G.I. Consultants was August 9, 2000. Therefore, prorating DeCalonne's annual salary based on his employment through August 9, 2000, DeCalonne earned $44,911.37 in salary wages in 2000. (Memorandum in Support of Defendant's Motion for Summary Judgment p. 18). DeCalonne argues that he was also entitled to payment for 224 hours of paid time off, or vacation pay, for the year 2000. (DeCalonne Dep. 75; DeCalonne Aff. ¶ 5, Ex. 2). G.I. Consultants contends that DeCalonne was only entitled to 200 hours of vacation pay for 2000. The parties also dispute how much paid time off DeCalonne had used in 2000: DeCalonne claims he only used 46.5 hours (DeCalonne Aff. ¶ 6); G.I. Consultants claims that DeCalonne used 74.5 hours of paid time off (Degitz Aff. ¶ 9, Ex.E). Finally, the parties dispute the amount DeCalonne actually received in pay for the year 2000. DeCalonne argues that he only actually received $44,440.64 for the year 2000. (DeCalonne Aff. ¶ 4). G.I. Consultants argues that it

paid DeCalonne $46,598.07 for the year 2000. (Degitz Aff. ¶ 7, Ex. C).

## DISCUSSION

### I. Summary Judgment Standard

"Summary judgment is proper only if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Gonzalez v. Ingersoll Milling Machine Co.*, 133 F.3d 1025, 1031 (7th Cir.1998) (quoting Fed.R.Civ.P. 56(c)). While the moving party "always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record, if any, which it believes demonstrate the absence of a [genuine issue of] material fact, there is nothing in Rule 56 that requires a moving party to negate an essential element of an opponent's claim for which the opponent will bear the ultimate burden at trial." *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Rather, the standard for granting summary judgment requires the district court to grant summary judgment if the record before us "could not lead a rational trier of fact to find for the non-moving party." *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

The burden is therefore on the non-movant to set forth "specific facts showing that there is a genuine issue for trial." *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir.1998) (quoting Fed.R.Civ.P. 56(e)). "In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 394 (7th Cir. 1998). Substantive law determines which facts are "material"; that is, those facts which might affect the outcome of the suit under the governing law. *See McGinn v. Burlington Northern R.R. Co.*, 102 F.3d 295, 299 (7th Cir.1996). Consequently, a dispute over irrelevant or unnecessary facts does not preclude summary judgment. *See Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir.1999).

The non-moving party may not rest on the allegations of the pleadings in opposing a motion for summary judgment. *See Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 540 (7th Cir.1998). Rather, the non-moving party must produce some evidence sufficient to show that a genuine issue of material fact exists. "Futhermore, a 'party needs more than a scintilla of evidence ... to defeat summary judgment.'" *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir.1998) (quoting *Senner v. Northcentral Technical College*, 113 F.3d 750, 757 (7th Cir.1997)). Thus, a summary judgment determination is essentially an inquiry as to whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

### II. False Claims Act Claim

The False Claims Act ("FCA") establishes a civil penalty for any person who is determined to have defrauded the government of the United States by submitting a false or fraudulent claim for payment. *See* 31 U.S.C. § 3729. The FCA also contains a provision which protects "whistle-blowers" who pursue, investigate, or contribute to a *qui tam* action, exposing such fraud on the government. The FCA encourages employees with knowledge that their em-

ployer is committing fraud on the government to come forward by protecting them against retaliation. *See* 31 U.S.C. §§ 3729–30. Specifically, Section 3730(h) provides:

Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms or conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under [the FCA], including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under [the FCA], shall be entitled to all relief necessary to make the employee whole.

■ To establish a retaliation claim under the FCA, § 3730(h) requires that the employee show (1) he engaged in protected activity; (2) his employer knew of this activity; and (3) his employer discharged or otherwise discriminated against him as a result of that activity. *See McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 514 (6th Cir.2000).

■ G.I. Consultants' first argument on summary judgment is that DeCalonne did not engage in protected activity under the FCA and therefore, he has not satisfied the first prong of § 3730(h). Determining what activities constitute protected activity under the FCA is fact-specific inquiry. *See Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 187 (3rd Cir.2001). As noted above, the FCA retaliation provision covers "investigation for, initiation of, testimony for, or assistance in an action filed or to be filed." The recent Seventh Circuit case of *Brandon v. Anesthesia & Pain Management Associates, Ltd.*, 277 F.3d 936 (7th Cir.2002) indicates that a plaintiff-employee must report wrongdoing externally in order to qualify for FCA protection. In *Brandon*, the Seventh Circuit stated that, "People in [Plaintiff's] position,

who choose to raise their concerns privately within their own company, rather than publicly, simply do not qualify for the FCA claim." *Id.* at 944.

However, this language directly contradicts an earlier decision of the Seventh Circuit in *Neal v. Honeywell, Inc.*, 33 F.3d 860 (7th Cir.1994). *Neal* held that the plaintiff-employee in that case had engaged in protected activity by notifying her employer's legal counsel of potential fraud. *See id.* at 865. The *Neal* court specifically rejected the argument that a plaintiff must communicate directly with the United States in order to qualify for FCA protection. *See id.* It is clear that one panel of the Seventh Circuit cannot overrule another implicitly. *See Brooks v. Walls*, 279 F.3d 518, 522–23 (7th Cir.2002). Overruling requires recognition of the decision to be undone and circulation to the full court under Circuit Rule 40(e). *Brandon* does not propose to overrule *Neal*, but only seeks to distinguish it. Moreover, the ground upon which the *Brandon* court distinguishes *Neal* is erroneous. The *Brandon* court states that "In *Neal* itself, the plaintiff had provided [ ] information to the government..." *Brandon*, 277 F.3d at 944. However, a careful reading of *Neal* shows that the plaintiff in that case only reported to her employer's legal counsel. It was the attorney who reported to the government. *See Neal*, 33 F.3d at 861. Accordingly, this Court declines to follow the language in *Brandon* which indicates that an employee must report wrongdoing externally to gain protection under the FCA.

Still, both *Neal* and *Brandon* indicate that a plaintiff must do more than merely report wrongdoing to supervisors internally. The *Neal* court indicated that a plaintiff's acts are only protected where litigation is a "distinct possibility," or "litigation could be filed legitimately—that is, consistently with Fed.R.Civ.P. 11." *See Neal*, 33 F.3d at 864. *Brandon* requires that plain-

tiff's internal complaints be done "in furtherance of" litigation.[2] *See Brandon,* 277 F.3d at 944–45. The court in *Brandon* did not find the plaintiff had engaged in protected activity because he never directly told the defendant shareholders that he believed they were violating the law and never threatened to bring a *qui tam* action until after he was discharged. *See id.*

Other circuits that have considered the issue have found that internal activity could be enough to qualify for protection under the FCA, but have differed as to what plaintiffs must do to show their actions were "in furtherance of" FCA litigation. In *Yesudian v. Howard University,* 153 F.3d 731 (D.C.Cir.1998), the D.C. Circuit found it sufficient that plaintiff be investigating matters that "reasonably could lead" to a viable False Claims Act case. In addition, the *Yesudian* court held that "an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations [is not enough].... To be covered, the plaintiff's investigation must concern 'false or fraudulent' claims." *Id.* at 740; *see also McKenzie v. BellSouth Telecommunications, Inc.,* 219 F.3d 508, 516 (6th Cir.2000) ("Although internal reporting may constitute protected activity, the internal reports must allege fraud on the government."); *Zahodnick v. International Business Machines Corp.,* 135 F.3d 911, 914 (4th Cir. 1997) ("Simply reporting his concern of a mischarging to the government to his supervisor does not suffice to establish that [plaintiff] was acting 'in furtherance of' a *qui tam* action"). Other courts have suggested that the following acts are enough to qualify for FCA protection: (1) recom-

mending the involvement of the employer's legal counsel, *see Hutchins v. Wilentz, Goldman & Spitzer,* 253 F.3d 176, 192 (3d. Cir.2001); and (2) characterizing the employer's acts as illegal or fraudulent, *see id., Robertson v. Bell Helicopter Textron, Inc.,* 32 F.3d 948, 951 (5th Cir.1994). Finally, several courts have held that in cases where the employee's job duties involve investigating and reporting fraud, the employee's burden of proving he engaged in protected conduct is heightened. *See Hutchins,* 253 F.3d at 191; *Eberhardt v. Integrated Design & Constr., Inc.,* 167 F.3d 861, 868 (4th Cir.1999) ("If an employee is assigned the task of investigating fraud within the company, courts have held that the employee must make it clear that the employee's actions go beyond the assigned task [in order to allege retaliatory discharge under § 3730].")

█ In this case, the Court believes Plaintiff has submitted enough evidence to preclude summary judgment on the issue of whether he engaged in protected activity. Viewed in the light most favorable to DeCalonne, the facts indicate that he told the doctors that he was concerned about potential fraud and that he would cooperate with the government if a fraud and abuse investigation were ever initiated. He recommended and sought the involvement of G.I. Consultant's legal counsel by raising the issue of the FAC program at the July 24, 2000 Board meeting, where legal counsel was present. Indeed, DeCalonne raised the fraud and abuse issue at the July 24, 2000 Board meeting with the intent that G.I. Consultant's legal counsel would become aware of the potential for a false claims action.[3] He also characterized

---

2. *Brandon's* analysis of internal complaints appears to be dicta given its earlier holding that only external complaints are protected.

3. DeCalonne's act of notifying legal counsel is similar to the actions of the plaintiff in *Neal v. Honeywell, Inc.,* 33 F.3d 860 (7th Cir.1994).

In *Neal,* the plaintiff's only "whistleblower" activity was that she told Honeywell's legal counsel that she believed her co-workers were falsifying ammunition test data at the Joliet Army Arsenal Plant, which Honeywell administered. The Seventh Circuit concluded that

the Board's actions as illegal and sought the legal advice of an outside attorney, Keith Barber. In addition, DeCalonne went beyond his assigned task of researching fraud and abuse issues when he raised the FAC program proposal with the Board on July 24, 2000, contrary to the recommendation of Dr. Horani and after it was clear that the Board did not intend implement DeCalonne's FAC program. Accordingly, the Court is satisfied that DeCalonne has submitted enough evidence to preclude summary judgment on the issue of whether he engaged in acts "in furtherance of" FCA litigation. It is unnecessary to proceed to the remaining requirements for an FCA claim. Summary judgment on the FCA claim will be denied.

### III. Indiana Wage Payment Claim

DeCalonne also brings a claim under the Indiana Wage Payment Statute, Ind.Code § 22–2–5, alleging that G.I. Consultants has failed to pay him a portion of the wages he was due for the year 2000. G.I. Consultants argues that DeCalonne's claim must fail as a matter of law because under the Wage Payment Statute, disputes concerning the amount rather than the timing of the payment are not actionable. However, as Plaintiff points out, a competing line of Indiana cases allows actions for disputed wage amounts, as well as for liquidated damages and attorney fees. Indeed, this issue is currently before the Indiana Supreme Court in *St. Vincent Hospital & Health Care Center v. Steele*, 742 N.E.2d 1029 (Ind.App.2001), *trans. granted*. Because the decision of the Indiana Supreme Court in *St. Vincent* may influence the outcome of DeCalonne's Wage Payment Statute claim in this case, that claim will be stayed pending the Indiana Supreme Court's ruling in *St. Vincent*.

### IV. Retaliatory Discharge Claim

DeCalonne also brings a claim for retaliatory discharge under state tort law. It appears, however, that DeCalonne cannot bring such a claim because he was employed pursuant to an employment contract rather than as an at-will employee. In *Remington Freight Lines, Inc. v. Larkey*, 644 N.E.2d 931 (Ind.App.1994), the Indiana Court of Appeals stated, "In Indiana, our Supreme Court has determined that, unlike the wrongful discharge of a time- or contract bound employee, the retaliatory discharge of an employee-at-will gives rise to a cause of action in tort, rather than a claim for breach of employment contract." *Id.* at 940. The court went on to say that it recognized that under its analysis, "the tort of retaliatory discharge [and its measure of damages] seems to place an employee-at-will in a better position than a contractually bound employee who may recover damages only through the end of his contract." *Id.* at 942–43. However, the court believed that "it is the province of the legislature to correct any inaccuracies [in the established common law of the State of Indiana]." *Id.* at 943.

Moreover, in *McClanahan v. Remington Freight Lines, Inc.*, 517 N.E.2d 390 (Ind.1988), the Indiana Supreme Court held that an employee could have an action in tort if he was discharged in retaliation for refusing to commit an illegal act for which he would be personally liable. *Id.* at 393. At first glance, *McClanahan* might appear to grant DeCalonne a cause of action. However, the *McClanahan* court specifically distinguished its prior ruling in *Morgan Drive Away, Inc. v. Brant*, 489 N.E.2d 933 (Ind.1986) on the basis that the employee in *Morgan* was employed pursuant to a series of employment contracts

---

the *Neal* plaintiff had engaged in protected

conduct under § 3730(h). *See id.* at 865.

and thus had a contract remedy. *(Morgan* had held that an employee could not maintain an action for retaliatory discharge when he was dismissed for filing suit against his employer.) Therefore, it seems clear that the Indiana Supreme Court did not contemplate that a contract-bound employee would have a cause of action in tort for retaliatory discharge. In short, being an at-will employee or an employee covered by a collective bargaining agreement, *see Bentz Metal Products Co., Inc. v. Stephans,* 657 N.E.2d 1245 (Ind.Ct.App.1995), is a threshold requirement for proceeding with any retaliatory discharge claim.[4] Here, DeCalonne has not met this requirement.

■ DeCalonne was clearly employed pursuant to an employment contract. The Indiana Supreme Court has stated:

> If there is an employment contract for a definite term, and the employer has not reserved the right to terminate the employment before the conclusion of the contract, the employer generally may not terminate the employment relationship before the end of the specified term except for cause or by mutual agreement. If there is no definite or ascertainable term of employment, then the employment is at-will, and is presump-

tively terminable at any time, with or without cause, by either party.

*Orr v. Westminster Village North, Inc.,* 689 N.E.2d 712, 717 (Ind.1997). DeCalonne's contract set a definite term of employment from July 19, 1996 through December 31, 2001. Moreover, the contract stated that DeCalonne could only be terminated with cause or without cause only if G.I. Consultants gave him ninety days notice. Therefore, DeCalonne's only avenue of recovery is via a breach of contract claim. Summary judgment on the retaliatory discharge claim will be granted.

## V. Breach of Contract Claim

■ DeCalonne's final claim alleges breach of his employment contract. Under DeCalonne's employment contract, G.I. Consultants could (1) on ninety days prior written notice, discharge DeCalonne without cause or (2) discharge DeCalonne with cause without any prior written notice. Defendant claims that it discharged DeCalonne with cause, namely, that DeCalonne had released confidential patient information to Heaton & Eadie without authorization. DeCalonne, however, has produced the minutes of the June 7, 1999 Board meeting, showing that he had informed the doctors that Heaton & Eadie

4. On April 2, 2002, Plaintiff filed supplemental authority in opposition to Defendants' motion for summary judgment. In this filing, Plaintiff argued that the recent Seventh Circuit case of *Goetzke v. Ferro Corporation, Crawford & Company, Inc.,* 280 F.3d 766 (7th Cir.2002), supports his position that a contract-bound employee may file a claim for retaliatory discharge. However, the *Goetzke* opinion is distinguishable from this case.

The plaintiff in *Goetzke* was employed subject to a collective bargaining agreement rather than an employment contract for a definite term. In *Bentz Metal Products Co., Inc. v. Stephans,* 657 N.E.2d 1245 (Ind.Ct.App.1995), the Indiana Court of Appeals acknowledged a distinction between collective bargaining agreements and employment contracts for a

definite term. *See id.* at 1249 ("However, filing a grievance, the remedy available to Stephens under the terms of the [collective bargaining agreement], is not the same as obtaining relief under a breach of contract action, which is the actionable claim of a wrongfully discharged employee under a contract for a definite term.") The *Goetzke* court explicitly stated that it believed the Indiana Court of Appeals' decision in *Bentz* was authoritative. *See Goetzke,* 280 F.3d at 773. Unlike *Goetzke* and *Bentz,* the employment agreement between G.I. Consultants and DeCalonne contained a definite term of employment. Accordingly, the precedent set in *Goetzke* is inapplicable to the facts of this case.

would require ten patient charts from each physician and that the Board had approved the study. Accordingly, DeCalonne has produced sufficient evidence to create a genuine issue of material fact as to whether he had authorization to release patient charts. Summary judgment on the breach of contract claim will be denied.

## VI. Motion to Strike

Defendant has submitted a motion to strike several portions of DeCalonne's affidavit on several different grounds. Defendant also seeks attorney fees incurred in preparing and submitting the motion to strike. At the outset, the Court denies as moot Defendant's objections to sentences 6, 7, and 8 of paragraph 22; Defendant's objections to paragraphs 9, 18, 20, 24, 27, 29; and Defendant's objections to Exhibits 1, 3, and 10 on the basis that the Court did not rely upon these sentences, paragraphs, and exhibits in ruling on the motion for summary judgment. The Court denies the remainder of the motion to strike for the following reasons:

### A. Portions Allegedly Inconsistent with DeCalonne's Deposition Testimony

■ G.I. Consultants seeks to strike paragraphs 3, 4, 5, 6, 7, 22, 23, and 26 on the basis that they conflict with DeCalonne's deposition testimony. Defendants rely on *Piscione v. Ernst & Young*, 171 F.3d 527, 532 (7th Cir.1999), which states that "A party cannot create an issue of fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition.... Thus when a conflict arises between a plaintiff's own sworn deposition and a sworn affidavit, the deposition testimony overrides statements made in the affidavit."

■ Paragraphs 3, 4, 5, 6, and 7 deal with DeCalonne's assessment of the amount of wages due him for the year 2000. Paragraphs 3 and 5 claim that DeCalonne was entitled to 224 hours of paid time off. Defendants cite DeCalonne's statement in his deposition that "I will retract, and make that 200 hours [of paid time off] instead of 224," for the proposition that the affidavit conflicts with the deposition. (DeCalonne Dep. 76). However, the entirety of the section that Defendant cites reads as follows:

> I will retract, and make that 200 hours [of paid time off] instead of 224. However, in the—in the employee guidelines manual, each employee is provided with three days [or twenty-four hours] of paid time off for sick, illness ...

(DeCalonne Dep. 76–77). Therefore, the Court does not find a conflict between DeCalonne's deposition testimony indicating that he was entitled to 200 hours plus three days of paid time off and his testimony in paragraphs 3 and 5 that he was entitled to 224 hours of paid time off. Paragraphs 3 and 5 will not be stricken.

■ Defendant also seeks to strike paragraph 4, which explains why DeCalonne believes that his W–2 does not accurately reflect the salary he received for 2000. In short, DeCalonne argues that the first payment he received in January 2000 included eight days of pay for 1999 and thus the W–2 figure is higher than his actual 2000 wages. Defendant attempts to twist DeCalonne's deposition testimony to argue that DeCalonne admitted that the W–2 figure was correct. In actuality, the exchange went as follows:

Q: [Y]ou've never noticed any discrepancies between [your] pay stubs -

A: Nope.

Q: - and the W–2, correct?

A: That's correct.

Q: And you would agree with me that if the W–2 is correct, that in fact you received all of the salary that you were entitled to for 2000, correct?

A: Um, *if the W–2 is correct,* um, that would be correct for the salary, but not for the paid time off due. *That's if that is correct.*

(DeCalonne Dep. 65–66) (emphasis added). Therefore, DeCalonne never conceded that the W–2 was correct with respect to the amount paid him in 2000. There is no conflict between paragraph 4 and the deposition testimony. Paragraph 4 will not be stricken.

Defendants next seek to strike paragraph 6 of DeCalonne's affidavit. Paragraph 6 states that DeCalonne only took 46.5 hours of paid time off in 2000. Defendant admits that DeCalonne also testified that he only took 46.5 hours of paid time off in his deposition as well. (Memorandum in Support of Defendant's Motion to Strike and Motion for Attorney Fees p. 3; DeCalonne Dep. 72). Therefore, there exists no conflict between the affidavit and DeCalonne's deposition testimony. In addition, Defendant seeks to strike paragraph 7 of the affidavit on the basis that it summarizes paragraphs 3 through 6. The Court has declined to strike paragraphs 3 through 6 and likewise will decline to strike paragraph 7.

■ Defendant also seeks to strike statements in paragraphs 22 and 26 on the basis that they conflict with DeCalonne's deposition testimony that Dr. Horani told DeCalonne "that the corporation would do their own fraud and abuse in their own way." (DeCalonne Dep. 54). Paragraph 22 states that Dr. Horani "advised [DeCalonne] to lay low and allow the matter to drop," and that "G.I. Consultants was going to table indefinitely the FAC program." Paragraph 26 states that, "Dr. Horani told [DeCalonne] . . . that [he] had to quit talking about the audit and the

FAC program." The Court believes that the statements in paragraphs 22 and 26 do not contradict DeCalonne's deposition testimony regarding his conversation with Dr. Horani. While the statements in paragraphs 22 and 26 may be extreme interpretations of what Dr. Horani said (as reported in DeCalonne's deposition), they are not contradictory.

■ Defendant next objects to the eighth sentence of paragraph 23, where DeCalonne states that he told some of the doctors "that he would have to do something about the non-compliant billing practices if they did not take corrective measures by proceeding with a FAC program." Defendant argues that this testimony conflicts with DeCalonne's deposition testimony where he stated that he had no intent to report the matter to the government. (DeCalonne Dep. 47, 51, 81, 87). However, there is clearly no conflict between these two statements: The affidavit testimony discusses what DeCalonne said to the doctors; the deposition testimony discusses what DeCalonne's intent was. The Court declines to strike the eighth sentence of paragraph 23.

**B. Exhibit 14**

■ Defendant also seeks to strike Exhibit 14 on the basis that it has not been properly authenticated. Defendant admits, however, that it has no reason to believe that Exhibit 14 is not authentic. Moreover, Fed.R.Evid. 901(b)(1) provides that testimony by a witness with knowledge can authenticate a document. In paragraph 20 of his affidavit, DeCalonne identifies Exhibit 14 as the cover letter to the Heaton & Eadie report sent to him on May 18, 2000. Clearly, DeCalonne would have knowledge of whether Exhibit 14 was actually the letter he received from Heaton & Eadie. In addition, the Advisory Committee's Note to Fed.R.Evid. 901(b)(4)

indicates that a letter can be authenticated by content disclosing knowledge of facts known peculiarly to the writer. Here, Exhibit 14 references G.I. Consultants' "baseline audit." It discusses the error rate in G.I. Consultants' billing practice. These facts would only be known to the Heaton & Eadie auditors. Finally, Exhibit 14 is printed on Heaton & Eadie letterhead. In *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416 (10th Cir.1991), the Tenth Circuit held that the fact that a document was printed on the letterhead of the person from whom it was purported to be sent was circumstantial evidence of authenticity. *See id.* at 1422. Accordingly, Exhibit 14 has been properly authenticated and will not be stricken.

G.I. Consultants also moves for attorney fees incurred in filing the motion to strike. Defendant bases this motion on Fed. R.Civ.P. 56(g) which provides that a court may order that a party pay a reasonable attorney fee should it appear to the satisfaction of the court that an affidavit presented for purposes of summary judgment is presented in bad faith or solely for the purpose of delay. Here, the Court believes that Defendant's motion to strike is not well taken. Those arguments for striking certain portions of DeCalonne's affidavit that the Court has analyzed herein are largely meritless. Moreover, as discussed above, the Court does not believe that DeCalonne's affidavit testimony was presented in bad faith because it is not inconsistent with his deposition testimony and is supported by other evidence before the court. Accordingly, the motion for attorney fees will be denied.

## VII. Motion to Ignore Defendant's Reply

Plaintiff has filed a "Motion to Ignore Defendant's Reply as Untimely Filed." Plaintiff argues that he filed and served on Defendant, by regular mail, "Plaintiff's Opposition to Defendant's Motion to Strike and Motion for Attorneys Fees" on February 28, 2002. The parties agree that Defendant filed its reply on March 14, 2002. By Plaintiff's calculation, the brief was due on March 13, 2002. Plaintiff's calculation is mistaken.

Pursuant to Local Rule 7.1, a party has seven days within which to file and serve a reply brief. Local Rule 7.1 specifically provides that this period of time must be computed in accordance with Fed.R.Civ.P. 6. Fed.R.Civ.P. 6(a) provides, in pertinent part, "[w]hen the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation." Moreover, when "notice or other paper" is served upon a party by mail, "3 days shall be added to the prescribed time period." Fed.R.Civ.P. 6(e). Fed.R.Civ.P. 6(a) further provides that, "[i]n computing any period of time prescribed or allowed by these rules, by the local rules of any district court, by order of court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included."

Plaintiff agrees that he served his response brief by regular mail on February 28, 2002. Under Fed.R.Civ.P. 6(a), the day of service must not be included in the computation of time. Pursuant to Local Rule 7.1 and Fed.R.Civ.P. 6(a) and 6(e), G.I. Consultants had seven (7) days in which to reply plus an additional three (3) days as a result of service by mail, all of which must be calculated excluding weekends. This calculation results in a reply deadline of March 14, 2002. (March 1 as one (1) day, March 4 through 8 as five (5) days and March 11 through 14 as four (4) days, for a total of ten (10) days). Accordingly, G.I. Consultants' reply brief was timely filed and Plaintiff's motion to ignore it will be denied.

Finally, the Court notes that both Defendant's motion to strike and Plaintiff's motion to ignore defendant's reply brief appear to be generally not well taken. It is the obligation of the parties to conserve judicial resources. Consequently, the parties are advised not to file such meritless motions in the future.

## CONCLUSION

Based on the foregoing, Defendant G.I. Consultant's motion for summary judgment is GRANTED in part, and DENIED in part. Plaintiff's claims under the Indiana Wage Payment Statute are STAYED pending the outcome of *St. Vincent Hospital & Health Care Center v. Steele*, 742 N.E.2d 1029 (Ind.App.2001), *trans. granted.* Defendant's motion to strike and motion for attorney fees is DENIED. Plaintiff's motion to ignore Defendant's reply brief is DENIED.