In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2486

Michael Brandon, M.D.,

Plaintiff-Appellant,

v.

Anesthesia & Pain Management
Associates, Ltd., Kumar S. Ravi,
M.D., James R. Boivin, M.D., and
Kathleen H. Slocum, M.D.,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 97-CV-1004--G. Patrick Murphy, Chief Judge.

Argued April 18, 2001--Decided January 18, 2002

   Before Harlington Wood, Jr., Diane P. Wood,
and Williams, Circuit Judges.

   Diane P. Wood, Circuit Judge.  Dr. Michael
Brandon was employed as an
anesthesiologist by Anesthesia & Pain
Management Associates (APMA). After
discovering that certain APMA doctors
seemed to be falsifying the bills they
submitted to Medicare, he brought his
concerns to the attention of the APMA
shareholders. This led in short order
first to problems at work and later to
his discharge. Believing that the
discharge was in retaliation for his
airing of the Medicare issue, Brandon
filed a lawsuit claiming that the
defendants had committed the Illinois
tort of retaliatory discharge. A jury
found in his favor, but not long
afterward the district court granted
APMA's motion for judgment as a matter of
law and vacated the jury verdict. The
court found as a matter of law that the
Illinois Supreme Court would not
recognize a retaliatory discharge claim
under the circumstances of Brandon's
case. In our view, the district court was
mistaken on this critical question of
Illinois law; we therefore reverse the
grant of the Rule 50 motion and order the
jury's verdict to be reinstated.

Furthermore, we conclude that the trial court should not have dismissed the punitive damage claims, which we remand for further proceedings.

I

Brandon began working as an anesthesiologist for APMA in September 1993. APMA provides anesthesia services to patients at St. Elizabeth's Hospital in Belleville, Illinois; approximately 45% of its patients are Medicare recipients. When Brandon was hired, APMA had four shareholder/ anesthesiologists: Dr. Kumar Ravi, Dr. Kathleen Slocum, Dr. James Boivin, and Dr. Maurice Boivin. (Maurice Boivin was no longer a shareholder at the time Brandon filed his complaint, which accounts for his absence in the list of defendants.) After two years on the job, Brandon was promoted to an associate position. Along with the promotion came a 42% pay raise and the ability to begin the process of becoming an APMA shareholder. Brandon also received a substantial bonus at the end of 1995.

As an associate, Brandon was now responsible (along with the shareholder-doctors) for filling out Medicare billing reports. He soon began to suspect that several of the shareholders were making alterations to reports or otherwise falsifying reports in order to receive Medicare reimbursement at rates higher than the rates to which APMA was entitled by law. Under the governing regulations, Medicare allows for more generous reimbursements for procedures that an anesthesiologist "medically directs" (because the bill includes both the doctor's services and the services of various assistants), than for procedures that the doctor "personally performs." There are limits, however, to the use of the "medically directed" rate; most importantly for present purposes, an anesthesiologist may not oversee more than four surgeries at a time. If she does, then the provider may bill (at a much lower rate) only for the services of the assistants who are actually performing the work.

In May or June 1996, Brandon contacted Medicare to obtain a copy of its regulations. After reviewing them, he became convinced that his colleagues'

practices were improper. Some, he thought, were falsifying the number of operations they were supervising, so that they could bill at the highest "medically directed" rate; others were altering the billing sheets to indicate that they were performing work, even though they had left the hospital for the day. Accordingly, at the shareholders' meeting held in early July 1996, he brought these issues to their attention and showed them copies of the relevant Medicare rules. The doctors seemed upset that he had contacted Medicare and worried about what he had told the Medicare authorities. Brandon assured them that he had asked Medicare only generic questions and had not divulged any information about APMA's billing procedures. He also suggested that the shareholders should hire another anesthesiologist, which would make it easier for them legitimately to meet the Medicare requirements for billing at higher rates. The shareholders told Brandon that they would look into the problem. (At trial, the shareholders argued that Brandon did not complain about Medicare fraud until November 1996. But since the jury found in Brandon's favor, we are taking his version of the facts as true.)

A few weeks later, on July 24, 1996, the shareholders told Brandon that his job performance was unsatisfactory, that they had received complaints about him, and that he should start looking for other work. Brandon found this suspicious, as no formal complaint had ever been filed against him, he had recently been promoted, and he had recently received a substantial raise. He pressed the shareholders for details about the alleged complaints against him, but they did not furnish any particulars. Around the same time, Brandon began keeping a journal documenting all of the cases in which he thought that APMA shareholders were improperly billing Medicare. He periodically brought these occurrences to the shareholders' attention, but he took no other action at that time.

On October 4, 1996, Slocum told Brandon that the shareholders had decided that he had to leave his job by the end of the year. Brandon protested that the shareholders were firing him only because of his challenges to their Medicare claims and that he planned to "take them

to court." Slocum answered, "We can do what we want with you. You don't have a contract."

On October 21 and 22, Brandon again brought his complaints to the attention of the shareholders. His effort did nothing but bring about a letter from the shareholders dated October 23, 1996, formally notifying him that he was discharged effective at the end of the year, but also giving him the option to resign. On November 1, 1996, Brandon met with the shareholders to discuss the termination; he again accused the shareholders of retaliating against him for pointing out the billing fraud. With strong, vulgar language, Slocum made it plain that Brandon was finished, and bluntly added, "You don't have a signed contract." At this time, Brandon, for the first time, threatened to report the alleged fraud to the government.

On November 4, the shareholders sent Brandon another letter making his termination effective immediately, but still urging him to resign. They suggested that if he did not resign, they could make it very difficult for him to find another job. Brandon refused to resign, and so he was terminated. Ten months after his termination, he reported APMA's billing practices to the U.S. Attorney's Office. (The record does not reflect what use, if any, the U.S. Attorney's Office made of his report.)

Brandon (a citizen of Missouri) then filed this diversity suit against APMA and its current shareholders (all Illinois citizens), alleging retaliatory discharge under Illinois law. The trial began on October 26, 1999. Two days later, at the close of Brandon's evidence, the defendants filed a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a); they renewed their motion at the close of all the evidence. The court reserved its ruling on the motions; it also refused Brandon's request for a punitive damages instruction. On November 3, 1999, the jury returned a verdict in favor of Brandon, awarding him $1,034,000 for lost earnings and $1,000,000 for pain and suffering and emotional distress.

But Brandon's victory was short-lived. About six months after the jury verdict,

the district court entered a final judgment granting the defendants' motion for judgment as a matter of law, vacating the jury verdict, and dismissing the complaint. This appeal followed.

II

The jury concluded that Brandon was fired for complaining about the shareholders' fraudulent billing practices, and we are not asked to overturn this determination. Rather, the question for us is whether this discharge was in retaliation for activities which are protected by the clearly mandated public policy of Illinois, and as such was tortious under Illinois law.

Illinois is an at-will employment state, which means that in general an employee can be discharged at any time for any reason or none at all. Pratt v. Caterpillar Tractor Co., 500 N.E.2d 1001, 1002 (Ill. App. Ct. 1986). Nevertheless, there are exceptions to that rule: one obvious one is that a forbidden characteristic such as race cannot be the reason for the actions of someone counting as an "employer." 775 Ill. Comp. Stat. Ann. 5/2-102 (West 2001). The tort of retaliatory discharge embodies another exception. A discharged employee may sue her employer for the common law tort of retaliatory discharge if her discharge was in retaliation for certain actions that are protected by the public policy of Illinois, including retaliation for complaints about an employer's unlawful conduct. Pratt, 500 N.E.2d at 1002; Hinthorn v. Ronald's of Bloomington, Inc., 519 N.E.2d 909, 911 (Ill. 1988). Unlike the federal False Claims Act ("FCA"), 18 U.S.C. sec. 287, which we discuss below, the Illinois tort does not require that the employee have reported the allegedly illegal conduct to the authorities, as long as she reported it to the employer, Lanning v. Morris Mobile Meals, Inc., 720 N.E.2d 1128, 1130-31 (Ill. App. Ct. 1999). The tort also does not require the employee to have been correct about the unlawfulness of the conduct, as long as she had a good-faith belief that it was unlawful. See Stebbings v. Univ. of Chicago, 726 N.E.2d 1136, 1144 (Ill. App. Ct. 2000).

As noted earlier, the district court did not overturn the jury's determination of

the reason for Brandon's termination: that he was fired for complaining about the billing practices. Instead, it found that Brandon's claim failed on two other grounds: (1) he "failed to show any clear mandate of Illinois public policy which his discharge contravenes," and (2) "even if such public policy exists, other means exist to vindicate it absent recognition of the tort of retaliatory discharge in this case." These are purely legal points that we review de novo. Doe v. Howe Military School, 227 F.3d 981, 990 (7th Cir. 2000).

### A. Public Policy Against Medicare Fraud

While the Illinois Supreme Court has acknowledged that "[t]here is no precise definition" of the term "clearly mandated public policy," Palmateer v. Int'l Harvester Co., 421 N.E.2d 876, 878 (Ill. 1981), the court has explained that "public policy concerns what is right and just and what affects the citizens of the State collectively. . . . [A] matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed." Id. at 878–89.

Illinois courts have identified two situations in which the "clear mandate of public policy" standard is met: (1) when an employee is fired for asserting a workers' compensation claim, Kelsay v. Motorola, Inc., 384 N.E.2d 353, 357–59 (Ill. 1978); and (2) when an employee is fired for refusing to engage in illegal conduct or reporting the illegal conduct of others ("whistle blowing" or "citizen crime fighting"). Palmateer, 421 N.E.2d at 879. Brandon's claim rests upon the latter of these two.

The defendants implicitly concede, as they must, that Brandon believed that the conduct about which he had complained amounted to Medicare fraud. Medicare fraud is covered by several federal felony statutes, including the FCA, which criminalizes the act of making false claims to the federal government (including overcharging for Medicare reimbursements), the False Statements Act, 18 U.S.C. sec. 1001, and the criminal Medicare and Medicaid anti-fraud and abuse provisions, 42 U.S.C. sec. 1320a-7 (West 2001).

Notwithstanding the fact that Illinois has long had a public policy that encourages citizens to report crimes, see Palmateer, 421 N.E.2d at 880, the district court took the rather narrow view that these federal criminal statutes could not provide a basis for Illinois public policy. It stated that Brandon had failed to prove "the existence of any clear mandate of Illinois public policy in favor of preventing health care fraud against the federal government rather than the State of Illinois," implying that state public policy would not be concerned with the defrauding of the federal government and the violation of federal statutes that make it a crime to commit Medicare fraud.

In so holding, the court erred. To begin with, under the Supremacy Clause of the United States Constitution, the state is required to treat federal law on a parity with state law, and thus it is not entitled to relegate violations of federal law or policy to second-class citizenship. See Claflin v. Houseman, 93 U.S. 130, 136-37 (1876). But we need not escalate this case to the constitutional level, because it is plain that the courts of Illinois have done no such thing. To the contrary, they have explicitly stated that it is a clearly established policy of Illinois to prevent its citizens from violating federal law and that the state's public policy encourages employees to report suspected violations of federal law if that law advances the general welfare of Illinois citizens. Russ v. Pension Consultants Co., 538 N.E.2d 693, 697 (Ill. App. Ct. 1989) ("The [Illinois] supreme court has held that public policy may be found in federal law. . . . [A]n Illinois citizen's obedience to the law, including federal law, is a clearly mandated public policy of this state. . . ."); Johnson v. World Color Press, Inc., 498 N.E.2d 575, 576 (Ill. App. Ct. 1986) ("Public policy can be found not only in the laws and judicial decisions of Illinois, but can also be found in federal law. Our supreme court . . . held that a cause of action for retaliatory discharge could be based upon a clearly mandated public policy which has been declared by Congress and which is national in scope.") (citations omitted).

There are many examples of Illinois cases in which reports about violations of federal law have given rise to valid claims of retaliatory discharge. See, e.g., Wheeler v. Caterpillar Tractor Co., 485 N.E.2d 372 (Ill. 1985) (employee was fired after reporting violations of Nuclear Regulatory Commission policy); Stebbings, 726 N.E.2d at 1145-46 (employee was fired for complaining about violations of federal radioactive materials regulations); Sherman v. Kraft Gen. Foods, Inc., 651 N.E.2d 708, 712 (Ill. App. Ct. 1995) (employee was fired for reporting violations of OSHA); Howard v. Zack Co., 637 N.E.2d 1183, 1190-91 (Ill. App. Ct. 1994) (employee was fired for reporting violation of federal record keeping regulations); Johnson, 498 N.E.2d 575 (employee was fired for reporting violations of federal securities laws). Furthermore, the Illinois legislature itself has explicitly articulated a state policy against all public benefits fraud:

Because of the pervasive nature of public assistance fraud and its negative effect on the people of the State of Illinois and those individuals who need public assistance, the General Assembly declares it to be public policy that public assistance fraud be identified and dealt with swiftly and appropriately considering the onerous nature of the crime.

305 Ill. Comp. Stat. Ann. 5/8A-1 (West 2001). Although in a highly technical sense APMA may not have committed state public benefits fraud, its discharge of Brandon violated the statutory policy against public benefits fraud in general. See Stebbings, 726 N.E.2d at 1142 (statute from which public policy can be inferred need not necessarily apply to the specific conduct at hand). Finally, the Illinois Supreme Court is particularly sensitive to the public policy underpinnings of statutes that affect the health and safety of citizens. United States ex rel. Chandler v. Hektoen Inst. for Med. Research, 35 F. Supp. 2d 1078, 1083 (N.D. Ill. 1999).

In short, the Illinois courts are under no illusions about the status of federal law as a source of public policy for the state of Illinois. The Illinois legislature has stated that it is the public policy of the state to identify

and end public benefits fraud; Illinois has an undeniable interest in ensuring that its citizens are obedient to federal law and that its public benefits recipients are not cheated out of proper medical care or benefits. Taking all this into account, we conclude that the Illinois Supreme Court would find that Brandon's discharge was in violation of the public policy of the state of Illinois.

### B. Alternative Means of Enforcement

Even if Brandon has established the elements of a retaliatory discharge claim, the Illinois courts have hinted in dicta that the claim may still be rejected if an adequate alternative remedy exists to vindicate the retaliatory discharge or otherwise to deter the activity that is inconsistent with public policy. "The tort of retaliatory discharge was not intended to serve as a substitute means for enforcement of particular laws." Stebbings, 726 N.E.2d at 1141. See also Hamros v. Bethany Homes & Methodist Hosp., 894 F. Supp. 1176, 1178-79 (N.D. Ill. 1995) (no retaliatory discharge claim for plaintiff fired for exercising his rights under the Family and Medical Leave Act (FMLA) since the FMLA already prohibits retaliation and this discharge presented a private matter between the employer and the employee).

Taking its lead from these cases, the district court also supported its decision on the ground that the FCA, which forbids the submission of knowingly false claims for money to the federal government, adequately protected the state's policy against public benefits fraud and provided Brandon with a sufficient remedy for the retaliatory discharge. The FCA permits the federal government to impose civil sanctions against fraudulent parties. 31 U.S.C. sec. 3730(a). It also allows a private individual to bring a qui tam action for fraud, on behalf of the federal government, and to recover an award of up to 30% of the proceeds of the action. See 31 U.S.C. sec. 3730(b)-(d).

But the existence of government-imposed criminal and civil sanctions for unlawful conduct cannot be the basis for inferring

that an employee cannot state a claim for retaliatory discharge when the employer fires her in retaliation for reporting the unlawful conduct. In most "whistle-blower" retaliatory discharge claims, the employee is objecting to conduct by her employer that carries criminal or civil sanctions. See Johnson, 498 N.E.2d at 578 (employee who complains about violations of the federal securities law is protected from retaliation even though the employer is subject to penalties for such Securities Act violations). If the district court's view were correct, the whole "citizen crime-fighter" species of retaliatory discharge claim would become extinct in Illinois. We see nothing in the scraps of language from other courts that would support such an important shift in Illinois law, and the Illinois Supreme Court itself has never taken such a step.

To the extent that alternative remedies are relevant, however, we disagree with the district court that the anti-retaliation provision of the FCA, 31 U.S.C. sec. 3730(h) (West 2001), is enough to bar Brandon's claim. Section 3730(h) states that:

Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

(Emphasis added). That relief includes reinstatement, double back pay with interest, "and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." 31 U.S.C. sec. 3730(h). The final phrase permits recovery for emotional distress. Neal v. Honeywell, Inc., 191 F.3d 827, 832 (7th Cir. 1999).

For Brandon to bring an action against APMA based on his discharge under sec. 3730(h), he would have to show that (1) his actions were taken "in furtherance of"

an FCA enforcement action and were therefore protected by the statute; (2) that the employer had knowledge that he was engaged in this protected conduct; and (3) that the discharge was motivated, at least in part, by the protected conduct. See United States ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 736 (D.C. Cir. 1998). The tort of retaliatory discharge, as we have already noted, does not require the employee to have reported the allegedly illegal conduct to the authorities. Lanning, 720 N.E.2d at 1131. People in Brandon's position, who choose to raise their concerns privately within their firm or company, rather than publicly, simply do not qualify for the FCA claim.

This conclusion disposes of the question whether there was an alternative path available to Brandon, unless his complaints could somehow be seen as something "in furtherance of" a yet-to-be-filed FCA enforcement action or Illinois would regard the FCA as "equivalent" even though it addresses a smaller set of cases than the state tort. The FCA covers "investigation for, initiation of, testimony for or assistance in an [enforcement] action filed or to be filed." 31 U.S.C. sec. 3730(h). In Neal v. Honeywell, 33 F.3d 860 (7th Cir. 1994) (Honeywell I), this court defined an "action" under sec. 3730(h) to include situations in which a qui tam action is a "distinct possibility," or "litigation could be filed legitimately--that is, consistently with Fed. R. Civ. P. 11." Id. at 864. We did not, however, define "in furtherance of" or otherwise describe the actions the employee must have taken in relation to the possibility of litigation. In Neal itself, the plaintiff had provided enough information to the government to trigger an investigation and that the employer was on notice of the investigation. Id. Luckey v. Baxter Healthcare Corp., 183 F.3d 730 (7th Cir. 1999), shed little light on this issue, stating simply that "[o]nly investigation, testimony, and litigation are protected." Id. at 733. Luckey also established that a retaliatory complaint had to be dismissed if the employer did not know about the whistle-blower's report before it discharged him.

What exactly had Brandon done that could

have been seen as protected conduct or a "precursor to [FCA] litigation?" He had notified the shareholders that he wasconcerned about their billing practices. He had contacted Medicare for information about Medicare billing rules. But were any of these actions "in furtherance of" a qui tam action? Did any of these actions put APMA on notice of the "distinct possibility" of a qui tam action? Under the circumstances here, we cannot find that APMA would have realized that it faced the "distinct possibility" of such an action. It is true that Brandon used terms like "illegal," "improper," and "fraudulent" when he confronted the shareholders about the billing practices. On the other hand, Brandon had never explicitly told the shareholders that he believed they were violating the FCA and had never threatened to bring a qui tam action. He never threatened to report their conduct to the government until after he was discharged. Compare Eberhardt v. Integrated Design & Constr., Inc., 167 F.3d 861, 867 (4th Cir. 1999). Brandon was simply trying to convince the shareholders to comply with the Medicare billing regulations. Such conduct is usually not protected by the FCA, see Yesudian, 153 F.3d at 740; Zahodnick v. Int'l Bus. Machs. Corp., 135 F.3d 911, 914 (4th Cir. 1997); United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1269 (9th Cir. 1996). Additionally, such conduct usually does not put an employer on notice of potential FCA litigation. See United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1523 (10th Cir. 1996) (Plaintiff's conduct in advising her superiors of non-compliance with Medicaid program requirements did not suggest to employer that she intended to bring an FCA action.).

It is more accurate to say that Brandon's investigation of the billing reports was part of the general course of his responsibilities. At trial, Ravi testified that one of Brandon's job duties was to ensure that the billing practices complied with Medicare rules and regulations. Thus, the fact that Brandon was alerting his supervisors to the possibility of their non-compliance with the rules would not necessarily put them on notice that he was planning to take a far more aggressive step and bring

a qui tam action against them or report their conduct to the government. See Eberhardt, 167 F.3d at 868 ("[I]f an employee is assigned the task of investigating fraud within the company, courts have held that the employee must make it clear that the employee's actions go beyond the assigned task" in order to allege retaliatory discharge under the FCA.); Ramseyer, 90 F.3d at 1523 n.7 (Persons whose jobs entail the investigation of fraud "must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations.").

Looking at all of the facts, it is unclear at best that Brandon engaged in activity that might have supported a suit under the FCA anti-retaliation provision. In this kind of situation, the Illinois Supreme Court has held that the employee remains free to pursue a remedy under the common law tort of retaliatory discharge. See Wheeler, 485 N.E.2d at 376-77. Following Wheeler and respecting the difference between the Illinois tort and the FCA claim, we conclude that allowing a state remedy in conjunction with thepotentially available federal remedy does "no violence to the interests protected by the Federal statute." Fragassi v. Neiburger, 646 N.E.2d 315, 318 (Ill. App. Ct. 1995). There is nothing in sec. 3730(h) to lead us to believe that Congress intended to preempt all state law retaliatory discharge claims based on allegations of fraud on the government.

Finally, even if there is some kind of federal remedy available under sec. 3730(h) (though not the kind of remedy Brandon wanted), it appears that the Illinois Supreme Court looks at this fact as one of many factors in a pragmatic approach toward determining when the tort of retaliatory discharge will lie. See Fellhauer v. Geneva, 568 N.E.2d 870, 876 (Ill. 1991). Compare Schweiker v. Chilicky, 487 U.S. 412, 424 (1988) (denying a Bivens-type remedy to claimants who were improperly denied disability benefits even though "Congress failed to provide for complete relief"); Bush v. Lucas, 462 U.S. 367, 388 (1983) (refusing to provide a Bivens remedy after acknowledging the congressional

remedy would not provide relief for the plaintiff's First Amendment injury). The state thus seems to take a more exacting approach to the availability of an alternative remedy than the Supreme Court has done for implied Bivens actions under the federal constitution. As the final authority on the common law of the state, it is of course entitled to do so.

III

Brandon also challenges the district court's refusal to instruct the jury on punitive damages. As a federal court sitting in diversity, we look to the law of Illinois to determine the appropriateness of punitive damages. Europlast, Ltd. v. Oak Switch Sys., Inc., 10 F.3d 1266, 1276 (7th Cir. 1993). Under Illinois law, "[w]hile the measurement of punitive damages is a jury question, the preliminary question of whether the facts of a particular case justify the imposition of punitive damages is properly one of law," Kelsay, 384 N.E.2d at 359, and our review is therefore de novo. Europlast, 10 F.3d at 1276.

In general, the Illinois Supreme Court does not favor punitive damages. Nevertheless, they may be awarded where "torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." Kelsay, 384 N.E.2d at 359. See also Cornell v. Langland, 440 N.E.2d 985, 987 (Ill. App. Ct. 1982) (punitive damages are appropriate where conduct is "intentional, deliberate and outrageous"). Punitive damages are an important part of a retaliatory discharge action:

In the absence of the deterrent effect of punitive damages there would be little to dissuade an employer from engaging in the practice of discharging an employee for filing a workmen's compensation claim. . . . The imposition on the employer of the small additional obligation to pay a wrongfully discharged employee compensation would do little to discourage the practice of retaliatory discharge, which mocks the public policy of this State.

Kelsay, 384 N.E.2d at 359; see also

Midgett v. Sackett-Chicago, Inc., 473 N.E.2d 1280, 1283-84 (Ill. 1984).

It is certainly important to recall, as APMA notes, that punitive damages are not appropriate in all retaliatory discharge cases. See Dixon Distrib. Co. v. Hanover Ins. Co., 641 N.E.2d 395, 400 (Ill. 1994) (actual malice is not necessarily established in every retaliatory discharge case). Only where the evidence offered by the plaintiff, if believed, would support a finding of malice, should a jury be given instructions on punitive damages. See Cirrincione v. Johnson, 703 N.E.2d 67, 70-71 (Ill. 1998).

According to Brandon's version of the events, when he told APMA's shareholders that they could not terminate him in response to his complaints, they dismissed him as "fucked" because he did not have a written contract and they told him, "We can do what we want with you." They fabricated complaints and made false evaluations of his job performance. They also took steps to prevent him from filing suit, threatening to make it difficult for him to find another job. Rather than responding appropriately to Brandon's complaints, the shareholders began a series of verbal and written communications in which they threatened to discharge him if he did not stop complaining about their billing procedures. These kinds of threats, harassment, and coercive tactics show a wilful and wanton disregard for Brandon's rights to investigate and report illegal conduct and therefore could support a jury award of punitive damages. See Cox v. Doctor's Assocs., Inc., 613 N.E.2d 1306, 1328 (Ill. App. Ct. 1993).

IV

Even though the tort of retaliatory discharge is a narrow exception to Illinois's doctrine of at-will employment, in appropriate cases it protects important public policies. "There is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens," Palmateer, 421 N.E.2d at 879, and APMA's discharge of Brandon for complaining about Medicare fraud violated this policy. Accordingly, we Reverse the district court's grant of judgment as a matter of law in favor of

the defendant and we Remand for
Reinstatement of the jury verdict in this
case. We Remand for a jury trial on
punitive damages.