2022 IL App (1st) 200973-U
No. 1-20-0973
Order filed May 9, 2022

First Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| GLYNIS HARVEY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 L 7203 |
| | ) | |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Gregory J. Wojkowski, |
| | ) | Judge, presiding. |

PRESIDING JUSTICE HYMAN delivered the judgment of the court.
Justices Walker and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirming jury verdict for appellee and trial court order denying appellant's motion for judgment *n.o.v.*, where appellee's complaint sufficiently alleged appellant violated "a clear mandate of public policy" by terminating her to state retaliatory discharge claim.

¶ 2    Glynis Harvey filed a *pro se* complaint for retaliatory discharge, alleging her former employer, the Chicago Transit Authority, fired her for raising concerns about the quality and testing of filters the CTA planned to install on its buses. Harvey contended that when she informed her superiors that NAPA Auto Part's oil filters were of inferior quality and could damage bus engines, they pressured her to fast-track testing and approval of the filters and fired her when she

refused to comply. The CTA moved several times to dismiss, alleging Harvey's complaint failed to establish it violated "a clear mandate of public policy," a necessary element of a retaliatory discharge claim. The trial court finally allowed the complaint. After trial, a jury returned a verdict for Harvey and awarded her $600,000 in damages.

¶ 3    The CTA filed a motion for judgment notwithstanding the verdict (judgment *n.o.v.*). The trial court granted the motion, in part, by reducing damages to $558,959, but otherwise found Harvey presented sufficient evidence for the jury to conclude the CTA terminated her for reporting a supervisor's attempts to abbreviate safety testing of oil filters, which violated a mandate of public policy requiring public common carriers to exercise the highest degree of care in the operation of its business to protect passengers and the public.

¶ 4    The CTA contends: (i) the trial court should have dismissed Harvey's complaint before trial because she failed to state a cause of action for retaliatory discharge by alleging the CTA violated "a clear mandate of public policy" by firing her, (ii) the trial court should have granted the motion for judgment *n.o.v.*, and (iii) Harvey does not present compelling reasons to recognize a tort of retaliatory discharge, a narrow exception to the general rule of at-will employment. We agree with the trial court that Harvey's complaint sufficiently alleged a cause of action for retaliatory discharge and identified a clear mandate of public policy the CTA violated in terminating her. We affirm.

¶ 5                                Background

¶ 6                            Procedural History

¶ 7    Harvey was self-represented when she filed a complaint for common law retaliatory discharge. She alleged the CTA fired her for complaining to her superiors about the use and

expedited testing of NAPA oil filters, which, she believed, "would void the engine manufacturer's warranty, potentially costing the CTA millions of dollars in engine repairs."

¶ 8    The CTA moved to dismiss the complaint under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2020) (Code)) for failing to plead that her termination violated a clearly mandated public policy. The trial court granted the CTA's motion and allowed Harvey to amend. Harvey then alleged her discharge violated the National Transit Systems Security Act of 2007 (NTSSA) (6 U.S.C. § 1142). Section 1142(a)(1) of the NTSSA provides whistleblower protections to public transportation employees who report on "fraud, waste, or abuse of Federal grants or other public funds intended to be used for public transportation safety or security." 6 U.S.C. § 1142(a)(1). Harvey alleged that if NAPA oil filters voided the engine manufacturer's warranty, the CTA would have to spend "millions of dollars in engine repairs," which was a matter of public policy because the CTA operated partially with federal funds.

¶ 9    The CTA again moved to dismiss under section 2-615, arguing that the NTSSA addresses security and domestic terrorism matters, which Harvey's termination did not implicate, and that her statement of public policy was too broad and general. The trial court granted the CTA's motion and again allowed Harvey to re-plead.

¶ 10    Harvey's second amended complaint continued to rely on the NTSSA for the statement of public policy. She alleged the CTA fired her in retaliation "for her efforts to further public policy by reporting what she reasonably believed to be wrongful and illegal conduct according to the National Transportation Security Act National Transit Systems Security Act 6 U.S.C. §1142 (a)(1)(c)" and the "CTA knew that it was illegal to fire [her] in retaliation for her efforts to further public policy by reporting what she reasonably believed to be wrongful and illegal conduct." The CTA again moved to dismiss under section 2-615 of the Code for failing to state a clear mandate

of public policy. After a hearing, the trial court dismissed the complaint with leave to amend. The court found "the public policy is adequately pled in the complaint but told Harvey she needed "to tie in [her] termination to [her] complaints about the filters."

¶ 11    Harvey filed a third amended complaint nearly identical to her second amended complaint, containing the same allegations about public policy and citing section 1142(a)(1) of the NTSSA. The CTA filed a combined motion to dismiss under section 2-619.1 of the Code. The CTA argued, in part, that under section 2-615, Harvey's complaint was legally deficient for failing to plead a clearly mandated public policy and retaliation. The trial court denied the motion, and the matter proceeded to discovery.

¶ 12    The CTA then moved for judgment on the pleadings, arguing that to the extent Harvey relied on the NTSSA, the statute provided its own enforcement mechanism and adequate remedies available to Harvey. The trial court denied the motion, ruling, in relevant part, that the NTSSA was not an adequate remedy because, by the time Harvey received her "right-to-sue" letter from the EEOC, her time to file a complaint with the Secretary of Labor under the NTSSA had expired.

¶ 13    In October 2019, the trial court held a three-day jury trial. (Harvey obtained legal representation before the trial and was no longer self-represented.)

¶ 14    Before trial, the CTA moved for summary judgment arguing, in part, that the evidence showed it discharged Harvey because of the findings of its internal audit, not in response to her earlier complaints about NAPA oil filters. The court denied the motion, finding that the cause of Harvey's discharge was a disputed fact.

¶ 15                                    Background

¶ 16    Harvey started as an electrical worker for the CTA in 1990. The CTA promoted her several times, and, in 2013, she held the title of assistant chief equipment engineer. (In addition, Harvey

performed the duties of the manager of technical services because the CTA had not filled the position.) Harvey's responsibilities included overseeing the testing and approval of bus parts and equipment for CTA buses, procuring new bus parts, and supervising a team of bus engineers. Harvey worked out of a heavy maintenance facility referred to as the "South Shops." She reported to chief bus equipment engineer James Caco, who reported to general manager Norman Santos. Santos's boss was George Cavelle, director of bus maintenance at the South Shops.

¶ 17   The CTA entered a supply-chain management contract with NAPA Auto Parts, a nationwide parts distributor. Under the contract, NAPA provided parts to the CTA for testing and possible installation on its vehicles. But, when NAPA proposed the CTA install its air and oil filters on CTA buses, Cummins Engine Company, the CTA's main engine manufacturer, told the CTA it would not allow its five-year warranty to extend to engines using NAPA oil filters.

¶ 18   At an April 2013 meeting with NAPA representatives, which Cavelle and Santos attended, Harvey explained that the NAPA oil filters were of inferior quality and, without proper testing, bus engines could "lock up," potentially damaging them, voiding the engine manufacturer's warranty, and costing the CTA millions of dollars. Harvey's department used a "standardized" testing procedure that required an engineer to visually inspect a part, install it on a bus for a specified amount of time, take it off the bus and inspect it to assess its viability for use. She said oil filters usually took longer to test because they required three oil changes on at least three different buses concurrently so that oil samples could be tested to detect engine damage. According to Harvey, Cavelle pressured her to circumvent the longer testing process and approve the NAPA filters in one month.

¶ 19   When she refused to comply with Cavelle's request for an abbreviated testing period for the NAPA oil filters, he told Santos and Caco to give her a written warning for "poor work

performance." Cavelle acknowledged he had never before disciplined Harvey or criticized her performance. Cavelle later e-mailed Santos asking if he had disciplined Harvey. Santos forwarded the e-mail to Caco, who responded that he could not write her up without evidence. Shortly after, Santos, rather than Caco, gave Harvey a written warning for poor work performance. Harvey contacted Human Resources complaining Cavelle pressured her to approve the NAPA oil filters before properly testing them. A few days later, the CTA terminated Harvey, as well as Caco and Santos.

¶ 20    Harvey contended the CTA fired her for raising concerns about the NAPA oil filters testing process. The CTA, however, countered it terminated her based on the findings of a 2013 internal audit of its parts inventory management practices. After the audit, the CTA's chief internal auditor, Andrell Holloway, issued a report stating that "the level of governance within the Bus Maintenance Tech Services & Engineering [was] weak" and presented significant risks to the CTA, including increased procurement costs, exposure to litigation, and reputational harm due to the appearance of vendor preferences. The report concluded that the South Shops' management "failed to demonstrate effective leadership or oversight, or promote high ethical standards to protect the interests of CTA," and recommended disciplinary action up to and including termination. As to Harvey, the report found she (i) failed to report an "under-money" practice CTA employees used to obscure expensive equipment purchases by documenting them as two separate smaller purchases to come under the CTA's spending limit, (ii) failed to inform auditors that new and unused equipment, including numerous laptop computers, were secretly stored at South Shops, (iii) lacked knowledge about the vendors' approval process, and (iv) violated ethics rules by accepting baseball tickets from a vendor.

¶ 21    The CTA does not dispute the evidence presented at trial or contest that the jury erred by finding it terminated Harvey for refusing to comply with Cavelle's request to expedite testing of the NAPA filters. At trial, Harvey presented the testimony of her two former supervisors, James Caco and Norman Santos, and testified on her own behalf.

¶ 22    Harvey testified that it usually took six to eight months to test a new oil filter. But, Cavelle told her the NAPA filters needed to be tested and approved as soon as possible. She also testified she told Caco and Santos she had concerns about not following testing protocols for the NAPA oil filters and that Cavelle was pressuring them to expedite approval.

¶ 23    The CTA presented Cavelle and Andrell Holloway, the CTA's former chief internal auditor, to support its argument that the decision to terminate Harvey arose out of the findings in the audit report.

¶ 24    After deliberations, the jury entered a verdict for Harvey and awarded her $600,000 in damages. The CTA filed a post-trial motion for judgment *n.o.v.* arguing that Harvey failed to establish that her discharge violated "a clear mandate of public policy" because her complaint did not rely on a specific state or federal law, rule, or regulation applicable to the CTA. Further, the CTA argued Harvey could not rely on the NTSSA for the statement of public policy because the statute did not apply to her situation and provided its own enforcement mechanism with adequate remedies. The CTA also challenged the amount of damages.

¶ 25    In a memorandum opinion and order, the trial court denied in part and granted in part the CTA's post-trial motion. The court rejected the CTA's request for judgment *n.o.v.* but reduced the jury's award of damages by about $40,000. The trial court found: "There was sufficient evidence at trial for the jury to conclude that the CTA's decision to terminate plaintiff's employment was because she was reporting or whistle-blowing on a supervisor's attempts to abbreviate safety

testing of oil filters, which would have violated a mandate of public policy that a public carrier is to exercise the highest degree of care in the operation of its business as a common carrier to protect its passengers. *Rotheli v. Chicago Transit Authority*, [7 Ill .2d 172, (1955)]."

¶ 26    In addition, the court observed that the CTA's contention was too restrictive of an interpretation of the law and to be actionable, the conduct did not need to be "non-compliance with a specific state or federal law, rule or regulation applicable to CTA."

¶ 27    Finally, the court determined that Illinois law allowed Harvey to assert a common law retaliatory discharge claim despite an alternate remedy under the National Transit System Security Act of 2007, 6 U. S.C. 1142 (a) (1) (c), relying on *Kavanaugh v. C. D. S. Office Systems Inc.*, 2014 WL 52912 at *7 (C.D. Ill. 2014) which cited *Brandon v. Anesthesia & Pain Management*, 277 F.3d at 936, 945. (7th Cir. 2002), "a more reasoned interpretation of the law."

¶ 28                                    Analysis

¶ 29    The CTA contends the trial court erred as a matter of law by not dismissing Harvey's complaint because she failed to sufficiently plead her discharge violated "a clear mandate of public policy," "a basic substantive requirement of a common law retaliatory discharge action." The CTA argues that even if Harvey's supervisors pressured her to expedite the testing process for the NAPA filters, she did not identify a legal requirement or industry standard the CTA violated. Further, the CTA argues it had no standard written procedure for testing oil filters, and the CTA's internal audit concluded that "the testing process appear[ed] to be discretionary." In short, the CTA contends testing of the NAPA filters was an internal dispute between employees with differing opinions about how to properly test the parts, which is not grounds for a retaliatory discharge claim.

¶ 30    The CTA also contends the trial court erred in denying its motion for judgment *n.o.v.*, noting that in its order the trial court found for the first time that Illinois common law governing

common carriers established the relevant public policy. The CTA asserts that aside from never mentioning this as the source of public policy, the trial court erred by misstating Illinois law governing common carriers and relying on the public policy of "passenger safety," which is too broad and general. The CTA argues Harvey failed to present evidence demonstrating it violated a legal standard established by statute, regulation, case-law, or industry-wide practices and asks that we reverse the jury verdict and enter judgment in its favor.

¶ 31                                    Standard of Review

¶ 32    A section 2-615 motion to dismiss (735 ILCS 5/2-615 (West 2020)) challenges the legal sufficiency of a complaint based on defects apparent on its face. *City of Chicago v. Beretta, U.S.A. Corp.*, 213 Ill. 2d 351, 364 (2004). The question presented by a section 2-615 motion to dismiss is whether the allegations of the complaint, when taken as true and viewed in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. A cause of action will not be dismissed on the pleadings unless it clearly appears that no set of facts can be proved entitling the plaintiff to a recovery. Because Illinois is a fact-pleading jurisdiction, a plaintiff must allege facts sufficient to bring his or her claim within the scope of the cause of action asserted. *Napleton v. Village of Hinsdale,* 229 Ill. 2d 296, 305 (2008). We review *de novo* an order granting or denying a section 2-615 motion. *Wakulich v. Mraz*, 203 Ill. 2d 223, 228 (2003). Further, it is well settled that a complaint failing to state a cause of action cannot support a judgment and that the failure to state a cause of action cannot be waived and may be raised at any time. *Orthopedic & Reconstructive Surgery, S.C. v. Kezelis*, 146 Ill. App. 3d 227, 231 (1986).

¶ 33                                    Retaliatory Discharge

¶ 34    Illinois is an employment at-will state. *Roberts v. Board of Trustees of Community College District No. 508*, 2019 IL 123594, ¶ 22; *Thierry v. Carver Community Action Agency of Knox*

*County, Inc.*, 212 Ill. App. 3d 600, 603 (1991). The law presumes at-will status for an employee hired without a written or oral employment contract expressly stating the duration of employment. *Id.* At-will employment allows an employer to fire an employee with or without a reason. *Roberts*, 2019 IL 123594, ¶ 22; *Palmateer v. International Harvester, Co.*, 85 Ill. 2d 124, 128 (1981). Retaliatory discharge claims constitute a narrow and limited exception to the general rule of at-will employment. *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 505 (1991). The tort of retaliatory discharge "seeks to achieve 'a proper balance * * * among the employer's interest in operating a business efficiently and profitably, the employee's interest in earning a livelihood, and society's interest in seeing its public policies carried out.' " *Turner v. Memorial Medical Center*, 233 Ill. 2d 494, 501 (2009) (quoting *Fellhauer*, 142 Ill. 2d at 507).

¶ 35    To state a claim for retaliatory discharge, an employee must plead: (i) the employer discharged the employee, (ii) in retaliation for the employee's activities, and (iii) in violation of a clearly mandated public policy. *Michael v. Precision Alliance Group*, *LLC,* 2014 IL 117376, ¶ 31. Whether a discharge violates a clear mandate of public policy raises a question of law for the court to resolve. *Turner,* 233 Ill. 2d at 501. A clear mandate of public policy affects the citizens of Illinois collectively and strikes at the heart of citizens' social rights. *Palmateer*, 85 Ill. 2d at 130. Evidence of public policy may be found in the state or federal constitutions and statutes and, when they are silent, in Illinois or federal case law. *Roberts,* 2019 IL 123594, ¶ 24 (citing *Palmateer*, 85 Ill. 2d at 130); see also *Wheeler v. Caterpillar Tractor Co.*, 108 Ill. 2d 502 (1985) (finding clearly mandated public policy enunciated in federal legislation and regulations, which were national in scope).

¶ 36    Just citing a constitutional or statutory provision in a complaint does not suffice to state a cause of action for retaliatory discharge. *Turner*, 233 Ill. 2d at 505. Instead, the employee must

articulate the clearly mandated public policy with specificity. *Ulm v. Memorial Medical Center*, 2012 IL App (4th) 110421, ¶ 21 (citing *Turner*, 233 Ill. 2d at 503). Moreover, the mandated public policy must be substantive enough to put employers on notice that employment decisions relating to the policy may expose them to liability. *Id*. "An employer should not be exposed to liability where a public policy standard is too general to provide any specific guidance or is so vague that it is subject to different interpretations." *Turner*, 233 Ill. 2d at 503 (quoting *Birthisel v. Tri-Cities Health Services Corp.*, 188 W.Va. 371, 377 (1992)).

¶ 37    Harvey contends her third amended complaint alleged the CTA violated a clear mandate of public policy expressed in the NTSSA, which provides that public transportation agencies, like the CTA, may not terminate an employee who provides information that he or she reasonably believes constitutes a violation of a federal law, rule, or regulation relating to public transportation safety or security, or fraud, waste, or abuse of federal grants or other public funds intended to be used for public transportation safety or security.

¶ 38    But the CTA argues the trial court should not have allowed Harvey to rely on the NTSSA as her source for a clear mandate of public policy. According to the CTA, the history, purpose, and language of the NTSSA indicates it addresses terrorism prevention and mitigation of damages "resulting from terrorist attack or other major incident" on public transportation systems and has no connection whatsoever with the testing process for replacement oil filters. Further, the CTA argues that absent allegations it violated a federal or state statute, rule, regulation, or industry-wide standard, Harvey's complaint fails to identify a clearly mandated public policy to support her retaliatory discharge claim.

¶ 39    Harvey contends the CTA waived the argument regarding the scope of the NTSSA. Harvey asserts that although the CTA raised arguments in the trial court, it did not raise the terrorism

argument, and cannot do so for the first time on appeal. See *Haudrich v. Howmedica*, Inc., 169 Ill. 2d 525, 536 (1996) ("It is well settled that issues not raised in the trial court are deemed waived and may not be raised for the first time on appeal.") In its motions to dismiss in the trial court, however, the CTA asserted that Congress enacted the NTSSA to implement the recommendations of the 9/11 Commission and that Harvey failed to identify which NTSSA policy her complaint implicated. This preserved the issue for appeal.

¶ 40    Turning to the merits, section 1142(a)(1)(c) of NTSSA states:

A public transportation agency, a contractor or a subcontractor of such agency, or an officer or employee of such agency, shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done--

(1) to provide information, directly cause information to be provided, or otherwise directly assist in any investigation regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to public transportation safety or security, or fraud, waste, or abuse of Federal grants or other public funds intended to be used for public transportation safety or security. 6 US.C. § 1142(a)(1)(c).

¶ 41    The few published decisions that have interpreted the NTSSA have not limited the statute to terrorism prevention or waste and abuse of terrorism grants or funds. Instead, courts have found it provides general whistleblower protections to public transit employees who engage in protected activity related to public transportation security and safety. See *Beall v. South Florida Regional Transportation Authority*, 2021 WL 3912652 ("NTSSA provides for employee protection from

retaliation because the employee has engaged in protected activity pertaining to public transportation or security"); *Bailey v. Metropolitan Council*, 2020 WL 3633132 (holding, NTSSA "prohibits adverse actions against employees who report hazardous safety or security conditions or refuse to work when confronted with such conditions"). So, the CTA's contention fails.

¶ 42    Alternatively, the CTA argues that even if the NTSSA is implicated, Harvey's allegations that she tried to prevent "fraud and abuse" of public funds is too broad to constitute a "clear mandate of public policy" needed to maintain a retaliatory discharge claim. See *Turner*, 233 Ill. 2d at 502-03 (public policy must be "clear" and "specific."). The CTA contends that Harvey's complaint alleged the CTA wasted and abused public funds, which is too broad and vague for a retaliatory discharge claim. The CTA primarily relies on *Turner* and *Roberts* for support.

¶ 43    In *Turner,* the plaintiff, a respiratory therapist, alleged his employer fired him in retaliation for informing the Joint Commission on Accreditation of Healthcare Organizations that his hospital's respiratory department did not conduct "immediate charting" after a patient visit, contrary to the Joint Commission's standard. The plaintiff also alleged the hospital's failure to immediately chart patient records "was not consistent with sound medical practices" and "jeopardized the safety of patients," rights recognized in the Medical Patient Rights Act (410 ILCS 50/1 *et seq.* (West 2020). *Id.* at 498.

¶ 44    Our supreme court affirmed the trial court's dismissal of the complaint, holding that the plaintiff failed sufficiently to plead the existence of a clearly mandated public policy. *Id.* at 508. The court reasoned that the general concept of "patient safety" is inadequate to justify an exception to the general rule of at-will employment. *Id.* Further, while the plaintiff identified the Joint Commission standards as a source of the public policy, he failed to "recite or even refer to a specific Joint Commission standard" that required immediate charting. *Id.* at 505.

¶ 45 Additionally, the cited statutory provision was "only concerned with record confidentiality, rather than record timeliness." *Id*. at 506. Thus, the statute did not speak to the particular recordkeeping practice. *Id*. at 505-06.

¶ 46 In *Roberts*, a former director of medical programs at a community college claimed his employer fired him for complaining that the school hired instructors for its phlebotomy and EKG classes who were not qualified under the standard of the National Accrediting Agency for Clinical Laboratory Sciences (NAACLS). The plaintiff alleged the Higher Education Act of 1965 (HEA) (20 U.S.C. § 1070 *et seq*. (2012)) established a clearly mandated public policy of enabling students to obtain federal funding for postsecondary education, and the defendant put students' federal loans at risk by hiring instructors who were not qualified under the NAACLS standard

¶ 47 The supreme court rejected plaintiff's argument because the Secretary of Education did not recognize the NAACLS as an accrediting agency for eligibility for federal funding and the plaintiff failed to identify a provision of the HEA requiring the appointment of certified instructors. So, the plaintiff failed to show his discharge for complaining that uncertified instructors violated a clearly mandated public policy of providing students federal funding.

¶ 48 The CTA contends that, as in *Turner* and *Roberts*, Harvey failed to identify a specific expression of public policy it violated because she did not cite a statute or regulatory standard governing the testing of bus engine filters. We disagree. Neither *Turner* nor *Roberts* imposes the minute requirement suggested by the CTA, which would dictate that a plaintiff must rely on a statute or regulation that expressly addresses the specific conduct the plaintiff complained about that resulted in termination. In *Roberts*, the plaintiff could not establish that the alleged public policy—federal funding of student loans—was jeopardized where the federal statute did not

require certified instructors. And in *Turner*, the plaintiff failed to "recite or even refer to a specific Joint Commission standard" that required immediate charting.

¶ 49    Conversely, the NTSSA, on which Harvey relies, expressly protects employees who raise concerns about waste and abuse of public funds from being discharged. Harvey's third amended complaint stated the parts approval process "[h]istorically" required (i) inspection, (ii) installation (for a predetermined period), and (iii) final analysis. And she alleged she "reasonably believed" the CTA and Cavelle, in particular, engaged in wrongful and illegal conduct that could lead to fraud, waste, or abuse of public funds by failing to follow this approval process and instead expediting testing of the NAPA oil filters. Unlike the plaintiffs in *Roberts* and *Turner*, Harvey's complaint specifically identified a public policy expressed in the NTSSA (waste and abuse of public funds) and alleged the CTA terminated her for bringing it to light.

¶ 50    Further, unlike the plaintiff in *Turner*, Harvey's complaint did not rely solely on general allegations of "public safety." She also alleged the CTA engaged in illegal conduct by terminating her for reporting that Cavelle pressured her to expedite approval of the NAPA filters, which could result in waste of public funds. As noted, the NTSSA expressly prohibits a public transportation agency, which includes the CTA, from discharging an employee who reports fraud, waste, or abuse of public funds. Harvey's complaint, unlike the plaintiffs in *Turner* and *Roberts*, alleged she reported what she reasonably believed was the waste or abuse of public funds, which is conduct addressed in the statute. So, Harvey's third amended complaint sufficiently identified the NTSSA as a clearly mandated public policy the CTA violated when it fired her. Thus, the trial court properly allowed the case to proceed to trial.

¶ 51                                  Judgment *N.O.V.*

¶ 52    A judgment *n.o.v.* is granted when the evidence, viewed in a light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 21. We review an adverse ruling on a motion for a judgment *n.o.v. de novo*; in other words, we apply the same standard as the trial court. *Harris v. Thompson*, 2012 IL 112525, ¶ 15.

¶ 53    The CTA argues that in denying the motion for judgment *n.o.v.*, the trial court improperly found for the first time that Illinois common law covering common carriers was the governing public policy. The CTA asserts that aside from never previously mentioning that as the source of public policy, the trial court erred by misstating Illinois law governing common carriers because no cases hold that a common carrier owes "the highest degree of care" in operating its business. Moreover, the CTA argues the trial court erred in denying its motion for judgment *n.o.v.* because Harvey failed to present evidence demonstrating it violated a legal standard established by statute, regulation, case-law, or industry-wide practices in firing her.

¶ 54    Whether the trial court correctly identified common law governing common carriers as the controlling public policy or correctly defined that common law is not determinative. As noted, Harvey's third amended complaint appropriately identified the NTSSA as a clear mandate of public policy and otherwise adequately alleged a retaliatory discharge claim. At trial, Harvey testified that Cavelle pressured her to circumvent the normal testing procedure. This supports her contention the CTA fired her in retaliation for reporting what she reasonably believed to be a potential waste of public funds used for public transportation safety, a public policy expressed in the NTSSA. So, the CTA failed to present grounds for setting aside the verdict, and the trial court correctly denied the motion.

¶ 55                                     "Compelling Circumstances"

¶ 56    The CTA argues that Harvey failed to present "compelling circumstances" requiring the court to recognize a retaliatory discharge claim as an exception to the general at-will employment rule. The CTA asserts: (i) recognizing Harvey's retaliatory discharge claim is unnecessary because the CTA can manage its own maintenance practices to ensure passenger safety, (ii) extending the tort of retaliatory discharge to the broad public policy of "passenger safety" could risk at-will employment for public transportation agencies, like the CTA, and (iii) extending the tort of retaliatory discharge to internal employee disputes would discourage innovation. None of these arguments is persuasive.

¶ 57    As to whether the CTA can be trusted to manage its own testing and maintenance practices, Harvey's complaint suggests it cannot. Even more significantly, Harvey's complaint does not, as the CTA posits, require the court to create an exception for a "broad" general policy of passenger safety. Nor does it extend the tort to an internal employee dispute. On the contrary, as noted, Harvey's complaint alleges the CTA violated a public policy expressly delineated in the NTSSA to prevent public transportation agencies from discharging or otherwise punishing employees for reporting what they reasonably believe to be a violation of "any federal law, rule, or regulation relating to public transportation safety or security, or fraud, waste, or abuse of federal grants or other public funds." This is "a clearly mandated public policy" and grounds for recognizing Harvey's retaliatory discharge claim.

¶ 58    The CTA also contends the NTSSA has an enforcement mechanism, section 1442(c) of the NTSSA, which weighs against finding "compelling circumstances" exist to find an exception to the general rule of at-will employment. That section permits an employee to file a complaint with the Secretary of Labor no later than 180 days after, in this case, termination. 6 U.S.C. § 1142(c)(1)-(3), (d) (West 2020). Then, the Secretary of Labor can investigate the allegations and, if they have

merit, order reinstatement, award backpay, compensatory damages, reasonable attorney's fees and costs, expert witness fees, and up to $250,000 in punitive damages. Id.

¶ 59     Harvey contends the CTA's argument fails because NTSSA does not provide for a private right of action. But assuming Harvey had an alternative remedy under the NTSSA by filing a claim with the Secretary of Labor, nothing prohibits her from also bringing a retaliatory discharge claim under Illinois law. See *Brandon v. Anesthesia & Pain Management Associates*, 277 F.3d 936, 945 (7th Cir. 2002). In *Brandon*, the plaintiff worked as an anesthesiologist at the defendant's medical facility. *Id*. at 938. His employer terminated him after he informed the employer that some of their doctors might have falsified bills submitted to Medicare. *Id*. at 939-40. The plaintiff, a Missouri resident, filed a diversity action alleging retaliatory discharge under Illinois law. *Id*. After a trial, the jury returned a verdict for the plaintiff awarding him $2,034,000. The district court granted the defendant's motion for judgment as a matter of law, vacated the verdict, and dismissed the plaintiff's complaint. *Id.* The district court reasoned that the plaintiff had failed to establish that his claim implicated an important public policy and that an alternative remedy existed under the federal False Claims Act. *Id*. at 941, 943.

¶ 60     The Seventh Circuit Court of Appeals disagreed with the district court and found that the potential for a remedy under the False Claims Act did not prevent the plaintiff from bringing his common law retaliatory discharge claim. *Id*. at 945. The Seventh Circuit explained that, under the False Claims Act, a plaintiff must show he or she took actions to further a False Claims Act enforcement action, that the employer knew that the plaintiff had engaged in this protected conduct, and discharged the employee, at least in part, because of the protected conduct. *Id*. at 944. Conversely, a common law retaliatory discharge claim requires a report about an employer's illegal conduct and the employee's discharge following the report, which can be an oral

communication to someone within the company. *Id*. Because the False Claims Act required the plaintiff to take actions that differed from the requirements to state a common law retaliatory discharge claim, the Seventh Circuit held that the plaintiff remained free to pursue his common law retaliatory discharge claim. *Id*. at 945.

¶ 61    Similarly, the elements needed to file a complaint under the NTSSA differ markedly from those required to establish a common law retaliatory discharge claim. Under the NTSSA, a claimant must show that his or her discharge or other discipline resulted from providing information "*in any investigation* regarding conduct which the employee reasonably believes constitutes a violation of any federal law, rule, or regulation relating to public transportation safety or security, or fraud, waste, or abuse of federal grants or other public funds intended to be used for public transportation safety or security." (Emphasis added.) 6 US.C. § 1142(a)(1)(c). Thus, because Harvey would need to take different and additional steps to bring a claim under the NTSSA—provide information in an investigation—the potential remedy under the NTSSA did not preclude her from bringing a retaliatory discharge claim.

¶ 62    Affirmed.